**CABLEVISION SYSTEMS CORPORATION and Cablevision Systems East Hampton Corporation, Plaintiffs,**

v.

**TOWN OF EAST HAMPTON and Town Board of The Town of East Hampton, Defendants.**

**No. CV–93–4536 (DRH).**

United States District Court, E.D. New York.

Sept. 12, 1994.

Rivkin, Radler & Kremer by William M. Savino, Steven J. Smirti, M. Paul Gorfinkel, Celeste M. Butera, Uniondale, NY, for plaintiffs.

Thomas J. Sinnickson, Center Moriches, NY, Robert T. Perry, Brooklyn, NY, for defendants.

### ORDER

HURLEY, District Judge.

In this action, Plaintiffs Cablevision Systems Corporation and Cablevision Systems East Hampton Corporation (collectively, "Cablevision") seek summary judgment (1) permanently enjoining Defendants Town of East Hampton (the "Town") and Town Board of the Town of East Hampton (the "Board") from revoking Cablevision's Cable Television Franchise Agreement with the Town, and (2) modifying the Franchise Agreement so as to bring it into compliance with federal law. The Town has cross-moved for summary judgment declaring that Cablevision materially breached the Franchise Agreement and that the Town Board appropriately rejected Cablevision's Request for Modification. For the reasons set forth below, Cablevision's application is granted, and the Town's application is denied.

### Factual and Procedural Background

In July, 1985, the Town entered into a Cable Television Franchise Agreement with Sammons Communications, Inc. ("Sammons"), which authorized Sammons to construct and operate a cable television system for the residents of the Town. In August, 1987, the Town approved the transfer of the franchise from Sammons to Cablevision.

When Cablevision succeeded Sammons as a party to the Franchise Agreement, Cablevision offered new customers an entry-level tier of cable service referred to as "Family Cable," which included 36 broadcast channels. (Pls.' Oct. 5, 1993 Mem. at 2.) "Family Cable" was the lowest-priced tier of service offered by Cablevision, and new customers were required to subscribe to this entry-level tier in order to receive cable service.

Cablevision offered a slightly different entry-level tier to the existing subscribers who had been customers of Sammons. These subscribers were offered a "Grandfathered tier," which initially consisted of 27 channels, and later was upgraded to include 30 channels. (*Id.* at 2–3.)

In February, 1993, Cablevision disclosed its plans to restructure its rates and its tiers "consistent with the anticipated guidelines to be issued ... by the Federal Communications Commission" under the Cable Television Consumer Protection and Competition Act of 1992 the ("1992 Cable Act"), 47 U.S.C. §§ 521–59. (*See* Defs.' Post–Hearing Submission to Town Board Ex. G.) More specifically, Cablevision announced that: (1) it would introduce a new entry-level tier of service, referred to as "Broadcast Basic," consisting of 10 channels; (2) the Grandfathered tier would be eliminated; and (3) the rates for the Family Cable tier would be increased.

Shortly after Cablevision made its announcement, the Town notified Cablevision that the implementation of any such changes would be a material breach of certain provisions of the Franchise Agreement. First, the Town contended that the introduction of the new entry-level tier violated Section 2(e) of the Agreement, which provides that "the

lowest priced package of programming that a subscriber can purchase ... *shall include a minimum of twenty-three (23) channels.*" (Franchise Agreement ("Fr.Agmt.") at § 2(e) (emphasis added).) Secondly, the Town contended that the elimination of the Grandfathered tier was in violation of Section 17(d) of the Agreement, which provides that Cablevision "shall not abandon any service or portion thereof without the written consent of the municipality." (*Id.* at § 17(d).) Finally, the Town contended that the rate increase for the Family Cable tier was a violation of Section 8 of the Agreement, which provides that the Town may regulate the rates charged by Cablevision to the extent permitted by law.

After some correspondence and negotiation between the parties, the Board enacted a resolution that disclosed that the Board had arrived at a preliminary assessment, pursuant to Section 24 of the Franchise Agreement,[1] to revoke the Agreement for cause. The Town also scheduled a hearing before the Board upon which a final determination as to revocation would be made.

Before the revocation hearing was conducted, and pursuant to § 545 of the 1992 Cable Act, Cablevision filed with the Town a "Request for Modification" of the Franchise Agreement. This Request sought to modify the Agreement so as to bring the Agreement into conformity with federal law. Cablevision also requested that the Board stay its revocation proceedings until it rendered a final decision regarding the Request for Modification. The Town replied that the scheduled hearing would serve as a forum for both modification and revocation issues.

On October 5, 1993, Cablevision requested from this Court a temporary restraining order precluding the Town from conducting the proposed hearing on revocation, pending decision on their modification request and judicial review of that request. This Court denied Cablevision's request to restrain the hearing of the Town's legislative body, but added that the Town should not take any

steps to implement any decision on revocation until review of the Request for Modification by the Court. *Cablevision Systems Corp. v. Town of East Hampton,* CV–93–4536 (E.D.N.Y. Oct. 5, 1993). The Board conducted its hearing on October 7, 1993, reserved decision on the issues of modification and revocation, and requested further submissions from each of the parties. Before the Town reached its decision regarding these issues, this Court denied Cablevision's request for a preliminary injunction preventing the Town from revoking its franchise. *Cablevision Systems Corp. v. Town of East Hampton,* CV–93–4536 (E.D.N.Y. Dec. 2, 1993).

On April 1, 1994, the Board issued its decision. The Board denied Cablevision's Request for Modification, and revoked Cablevision's franchise with the Town. The effective date of the revocation is October 1, 1994. Cablevision renewed its application for a preliminary injunction, and this Court denied the application. Cablevision then orally requested that the Court consolidate the trial of this action with its application for preliminary injunctive relief, Fed.R.Civ.P. 65(a)(2), and moved for summary judgment. Fed. R.Civ.P. 56. The Defendants orally cross-moved for summary judgment. Both parties confirmed these requests in writing. (Pls.' Letter of Apr. 6, 1994; Defs.' Letter of Apr. 8, 1994.) By way of format, it was agreed that with the exception of certain materials that had been submitted to the Town Board concerning modification and revocation, the summary judgment requests would not entail the submission to the Court of any additional materials, each side relying on the materials previously furnished with respect to the declaratory and injunctive relief.

### Discussion

### I. Standard for Review of Motion for Summary Judgment

■ A motion for summary judgment may be granted only when it is shown that "there is no genuine issue as to any material

---

1. Section 24 of the Franchise Agreement provides, in relevant part:
 *Material Breach of Franchise.* [I]n the event [Cablevision] has breached a material provision of this Franchise and has failed to cure the breach within thirty (30) days' notice from the Town ... [the] Town shall have the right to revoke this Franchise.

fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987); *Winant v. Carefree Pools,* 709 F.Supp. 57, 59 (E.D.N.Y.), *aff'd,* 891 F.2d 278 (2d Cir.1989). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989); *Pariente v. Scott Meredith Literary Agency, Inc.,* 771 F.Supp. 609, 612 (S.D.N.Y.1991). The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ Once the moving party has come forward with support demonstrating that no genuine issue of material fact remains to be tried, including pleadings, depositions, interrogatory answers, and affidavits, the burden shifts to the non-moving party to provide similar support setting forth specific facts about which a genuine triable issue remains. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; *Borthwick v. First Georgetown Sec., Inc.,* 892 F.2d 178, 181 (2d Cir.1989); *Donahue,* 834 F.2d at 57. The Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *Donahue,* 834 F.2d at 57.

■ "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of

material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510. Moreover, "[c]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991); *see also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting *Borthwick,* 892 F.2d at 181, and *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)). With the above principles in mind, the Court turns to a discussion of the case at bar.

## II. *Asserted Grounds for Revocation*

In support of its decision to revoke the franchise, the Town contends that, in implementing certain tiering and rate changes, Cablevision has breached material provisions of the Franchise Agreement. In response, Cablevision asserts that each of its actions were "consonant with, authorized and/or dictated by the ... 1992 Cable Act." (Pls.' October 5, 1993 Mem. at 17.) To determine whether summary judgment is appropriate in this case, the Court will examine each of the alleged grounds for revocation: the establishment of a basic cable service with fewer than 23 channels; the rate increase for the Family Cable tier; and the elimination of the Grandfathered tier.[2]

---

2. In its initial resolution, which detailed the alleged material breaches of the Franchise Agreement, the Town alleged four additional grounds for revocation: the elimination of free additional converter boxes; the failure to respond to requests for information; the failure to timely re-

store the public access station; and the elimination of certain Connecticut broadcast stations. (Town Board's Apr. 1, 1994 Findings of Fact at ¶ 42.) The Town subsequently concluded, however, that these alleged actions did not constitute material breaches of the Franchise Agreement.

## A. *Establishment of a Basic Cable Service with Fewer than 23 Channels*

█ The first alleged ground for revocation is Cablevision's introduction of the "Broadcast Basic" entry-level service tier, which includes fewer than 23 channels. The Town claims that the introduction of the Broadcast Basic tier violates the Franchise Agreement, in that the Agreement provides that "the lowest priced package of programming that a subscriber can purchase ... *shall include a minimum of twenty-three (23) channels.*" (Fr.Agmt. at § 2(e) (emphasis added).)

In response, Cablevision contends that the contents requirement of Section 2(e) is preempted by Section 543(b)(7)(A) of the 1992 Cable Act, which provides that cable operators must offer a "basic service tier,"[3] and sets forth certain "minimum contents" requirements for that tier.

Section 543 provides that

Each cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service. Such basic service tier shall, at a minimum, consist of the following:

(i) All signals carried in fulfillment of the requirements of sections 534 and 535 of this title.[4]

(ii) Any public, educational, and governmental access programming required by the franchise of the cable system to be provided to subscribers.

(iii) Any signal of any television broadcast station that is provided by the cable operator to any subscriber, except a signal which is secondarily transmitted by a satellite carrier beyond the local service area of such station.

47 U.S.C. § 543(b)(7)(A).

In support of its position that this Section preempts the contents requirement of the

Franchise Agreement, Cablevision relies upon the FCC's interpretation of Section 543(b)(7)(A). In its first Report and Order regarding the 1992 Cable Act (hereinafter "Rate Order"), FCC 93–177, 58 Fed.Reg. 29736, 1993 WL 169306 (F.R.) (released May 3, 1993), the FCC carefully detailed the historical context and underlying purposes of the Act, and addressed certain issues regarding the implementation of the Act. One issue squarely addressed by the FCC was the preemptive effect of the minimum contents requirements of the Act. After reviewing the positions of both cable operators and franchising authorities, the FCC concluded that "the statutory definition of the basic service tier preempts provisions in franchise agreements that require additional services to be carried on the basic tier." Rate Order at ¶ 161.

In support of its conclusion, the FCC relied upon the legislative history of Section 543(b)(7). For example, in the Report of the House Committee on Energy and Commerce, H.R.Rep. No. 102–268, 102d Cong., 2d Sess. at 85 (the "House Report"), the Committee discussed its intent that any franchise provisions requiring or permitting carriage of public, educational, or governmental channels ("PEG" channels) on other than the basic tier were not intended to be preempted by Section 543. Rate Order at ¶ 161. As the FCC explained,

[h]ad the Committee, whose provision on the composition of the basic tier was substantially enacted into law, not intended to preempt provisions in franchise agreements specifying the contents of the basic tier, there would have been no need for the Report language on the specific question of the PEG channels.

*Id.*

The FCC also focused upon the House Report's explanation that the basic tier must

---

(*See id.* at ¶¶ 60–62; Defs.' Letter of Apr. 6, 1994 at 2 n. 1.)

**3.** Cablevision contends, and the Town does not dispute, that to meet these minimum contents requirements, Cablevision need only provide the 10 channels that it has included in its "Broadcast Basic" tier.

**4.** Section 534 requires the cable operator to carry the signals of local commercial television stations, and Section 535 requires the operator to carry the signals of qualified noncommercial educational television stations.

include all of the requirements of Section 543(b)(7)(A), "as well as 'other video programming signals that the cable operator *may choose* to provide on the basic tier.'" *Id.* at ¶ 161 n. 427 (citing House Report at 60). The FCC concluded that this language "indicates that Congress intended to leave the composition of the basic tier beyond the minimum specified in the Act to the choice of cable operators" rather than to the choice of franchising authorities.

Finally, the FCC believed that the preemption of minimum contents requirements in franchise agreements was in keeping with the underlying purposes of the 1992 Cable Act:

> the Act's preemption of local franchise control reflects a balance among competing interests: franchising authorities were given greater regulatory authority over basic service rates and cable operators were given greater discretion over the content of their basic service.

*Id.* (citation omitted). The FCC later reaffirmed its position that preemption is consistent with the purposes of the Act, explaining that "[a]llowing franchising authorities to continue to enforce service requirements for the basic tier that are well beyond the statutory requirements would clearly compromise Congress's principal concern in enacting the 1992 Cable Act that cable operators provide local services on a basic tier at reasonable rates." First Order on Reconsideration, Second Report and Order, FCC 93–428, 58 Fed. Reg. 46718–01, 1993 WL 332090 (F.R.) (Released Aug. 27, 1993) at ¶ 86.

 The Town contends, however, that the FCC's interpretation of the preemptive effect of Section 543(b)(7)(A) is incorrect, and therefore, its "ruling must be rejected." [5] (Defs.' Oct. 27, 1993 Mem. at 22.) In determining the deference that should be accorded to the FCC's ruling, the Court looks to the seminal Supreme Court case in this regard, *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct.

2778, 81 L.Ed.2d 694 (1984). According to *Chevron,* the Court must first look to whether Congress has directly spoken to the precise question at issue: "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781. If, however, Congress has not directly addressed the issue, the Court may not simply impose its own construction on the statute. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2781.

Thus, under *Chevron,* the Court first considers whether Congress has directly spoken to the issue of preemption. Cablevision contends that "the unambiguous provisions of the statute show Congressional intent to preempt." (Pl. Reply Mem. at 12.) Under the general preemption provision of the 1992 Cable Act,

> any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is *inconsistent* with this chapter shall be deemed to be preempted and superseded.

47 U.S.C. § 556(c) (emphasis added). Cablevision contends that a franchise agreement that requires a cable operator to provide more than the minimum contents set forth in Section 543 is inconsistent with the Act; and, therefore, Congress intended to preempt any such franchise provisions.

The Court, however, is hesitant to find that the Act is unambiguous in this regard. *See National Weather Serv. Employees Org. v. Brown,* 18 F.3d 986, 990 (2d Cir.1994). Section 543 merely sets forth the "minimum" requirements for the basic service tier—in other words, it sets forth the "least quantity" that will satisfy the standards of the Act. *Webster's Third New Int'l Dictionary* 1438

---

5. The Court notes that although the Town, in reaching its decision on revocation, declined to follow the FCC's interpretation of the minimum contents requirement, the Franchising Agreement explicitly provides that "should any provi-

sion of this Franchise be inconsistent or at variance with any rule, regulation or policy, in whole or in part, of the FCC ... such provision shall be invalid...." (Fr.Agmt. at § 27(b).)

(1986). Therefore, the Section is not, on its face, inconsistent with provisions of franchise agreements that require cable operators to carry these minimum channels *as well as* certain additional channels. The Court thus does not find a clear Congressional intent to preempt such contents requirements of franchise agreements.

■ The Court, therefore, must undertake the second portion of the *Chevron* inquiry: whether the agency's answer is based on a permissible construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. In reviewing the agency's interpretation, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11.

In this case, the Court finds that the FCC's determination that Section 543(b)(7)(A) preempts the contents requirements of franchise agreements is a permissible construction of the Act, and thus, under *Chevron,* defers to this interpretation. The legislative history of the Act indicates that although cable operators may choose to include additional channels on the basic service tier, they should not be bound to do so by franchise agreements that pre-date the 1992 Cable Act. *See supra* at 881–82. Moreover, a review of the "Rate Orders" clearly demonstrates that the FCC is familiar with the complex and technical regulatory scheme that is the 1992 Cable Act, considered the matter in a detailed and reasoned fashion, and took into account the conflicting policies underlying the Act. *See Chevron,* 467 U.S. at 865, 104 S.Ct. at 2792–93. Thus, based upon the reasoning of the FCC, the Court finds that Cablevision acted in conformity with the 1992 Cable Act in introducing the Broadcast Basic entry-level tier, and that the

Act preempts the minimum contents requirements of the Franchise Agreement. *Cf. City of Ellensburg v. King Videocable Co.,* No. 92 2 00304 1, slip op. at 5–6 (Super.Ct.Wash. May 17, 1994). The retiering was not, therefore, a valid ground for revocation of the franchise.

## B. *Rate Increase for the Family Cable Tier*

■ As a second ground for revocation of the franchise, the Town contends that the April 1, 1993 rate increase for the Family Cable tier violated Section 8 of the Franchise Agreement, which provides that the Town may regulate cable service rates to the extent permitted by law.[6]

In response, Cablevision contends that, under the 1992 Cable Act, the Town is not permitted to regulate the rates for the Family Cable tier. Cablevision relies upon a provision of the 1992 Cable Act concerning the regulation of rates, which provides, in pertinent part, that

[a]ny franchising authority may regulate the rates for the provision of cable service . . . to cable subscribers, *but only to the extent provided under this section.*

47 U.S.C. § 543(a)(1). With regard to cable systems such as the one operated in East Hampton, Section 543 only permits franchising authorities to regulate "the rates for the provision of *basic cable service....*" *Id.* at § 543(a)(2)(A) (emphasis added). The Section does not permit franchising authorities to regulate any other tier of service. *See* Rate Order at ¶ 169 ("tiers other than the basic service tier are subject only to Commission jurisdiction").

It is uncontested that, upon the introduction of Broadcast Basic, the Family Cable tier was no longer "basic cable service," as defined in the 1992 Cable Act.[7] (*See* Defs.'

---

6. Section 8 of the Franchise Agreement provides, in relevant part, that

[e]xcept as provided in Title VI of the Communications Act of 1934 [as amended, 47 U.S.C. §§ 521–59], no increases in basic cable service rates charged to subscribers shall be made except as authorized by Town after due public notice and a public hearing on such increase is held and interested parties have been afforded an opportunity to comment thereon, and final

approval by the [New York State Commission on Cable Television].

7. In its Rate Order, the FCC explained that "the plain language of the 1992 Cable Act leads us to the conclusion that for purposes of rate regulation, the Act contemplates the existence of *only one basic tier....,* which is defined as that tier containing broadcast stations (except superstations) and required [public, educational, and gov-

Oct. 27, 1993 Mem. at 17.) Thus, Cablevision contends that the Town is not permitted to regulate the rates for the Family Cable tier, and that the rate increase is not a valid ground for revocation of the Franchise Agreement.

 The Town apparently concedes, and the Court agrees, that the Town has no authority to regulate the rates for the Family Cable tier under the 1992 Cable Act.[8] The Town submits, however, that on the date that the rate changes were implemented, the 1992 Act was not in effect. (Defs.' Apr. 4, 1994 Mem. at 28–30.) The Town contends that under the previous Cable Act, the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–59 ("1984 Cable Act"), which was in effect at the time of the rate increase, the Town retained the authority to regulate the rates for the Family Cable tier. (*Id.* at 30–35.) Therefore, the Town contends that the unapproved rate increase was a material breach of the Franchise Agreement, and is a ground for revocation. (*Id.* at 37–39.)

First, the Court considers whether the 1992 Cable Act was in effect at the time of the rate changes. The amendments to Section 543 of the 1992 Cable Act were enacted on October 5, 1992, and the amendments became effective 180 days after the date of enactment. 47 U.S.C. § 543. Therefore, the amendments were effective on April 3, 1993. *See id.; see also Time Warner Entertainment Co. v. Briggs,* Civ.A. No. 92–40117–GN, 1993 WL 23710, at *4 (D.Mass. Jan. 14, 1993). The Town is thus correct in asserting that because Cablevision implemented its rate changes on April 1, 1993, it did so prior to the effective date of the relevant provisions of the 1992 Cable Act.[9]

That Cablevision implemented its rate increase a mere two days prior to the effective date, however, does not necessarily constitute a valid ground for the revocation of the franchise. Even assuming that, under the 1984 Cable Act, the Town possessed the authority to regulate the rates for the Family Cable tier,[10] the Court is not persuaded that the Town may revoke the franchise.

---

ernmental access] channels." Rate Order at ¶ 169.

**8.** At best, the Town suggests that the retiering of the Family Cable tier and the associated rate increase was an "attempt to evade and circumvent the imminent freeze on cable rates ordered by the FCC on April 5, 1993." (Defs.' Oct. 27, 1993 Mem. at 19; *see also* Defs.' Apr. 4, 1994 Mem. at 28.) Assuming that this statement is to be read as a contention that the rate increases were in violation of FCC regulations against evasions of the requirements of the Cable Act, *see* 47 U.S.C. § 543(h), the Town's argument must fail. Firstly, Cablevision has merely made conclusory allegations that the Town's actions were "evasive" within the meaning of the Cable Act; and conclusory allegations "will not suffice to create a genuine issue" of material fact. *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (citations omitted), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). Secondly, based upon the reasoning of the FCC, it does not appear that Cablevision's retiering and accompanying rate increase were evasive in nature. *See* Rate Order at ¶ 454 (because many cable operators will be required to retier to comply with the 1992 Cable Act, retiering effectuated between the date the 1992 Cable Act was enacted and the effective date of the rate regulations is not a *per se* evasion of rate regulation), ¶ 453 (under the mechanism by which the FCC sets cable service rates, cable

operators would not have any monetary incentive to retier or increase rates). Finally, even if Cablevision's actions were evasive in nature, it appears that the appropriate redress for such actions would be provided by the FCC's special rate regulation proceedings, *see* Rate Order at ¶ 454, rather than by revocation of the franchise.

**9.** The Court addresses *infra* at 886–87 the Town's contention that the elimination of the Grandfathered tier on March 15, 1993, also resulted in a rate increase.

**10.** Cablevision contends that, even under the 1984 Cable Act, its rate increase for the Family Cable tier was appropriate. Because the Court finds that, even if inappropriate under the 1984 Act, Cablevision's actions do not constitute a material breach of the Franchise Agreement, the Court declines to determine whether Cablevision violated the 1984 Act. However, having reviewed the applicable provision of the 1984 Act, 47 U.S.C. § 522(3), the relevant case law, *see, e.g., American Civil Liberties Union v. Federal Communications Comm'n*, 823 F.2d 1554 (D.C.Cir.1987) *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), FCC interpretations of the 1984 Act, *see, e.g.*, Rate Order at ¶ 170, as well as Cablevision's marketing materials (Appendix to Pls.' Oct. 29, 1993 Mem. at Ex. 11), the Court notes that cablevision's compliance with the rate regulation provisions of the 1984 Act is open to debate.

■ The parties agree that, to warrant revocation, Cablevision must have materially breached the Franchise Agreement. (*See* Pls.' Oct. 29, 1993 Mem. at 20–21; Defs.' Apr. 4, 1994 Mem. at 37–39; *see also* Fr. Agmt. at § 24.) "A material breach ... has been defined as one that would justify the other party to suspend his own performance of the contract." *Lanvin Inc. v. Colonia, Inc.*, 739 F.Supp. 182, 195 (S.D.N.Y.1990) (citing 6 *Williston on Contracts* § 864 at 290 (3d ed. 1963); 12 *Williston on Contracts* § 1469 at 186 (3d ed. 1970)). It is well-settled that, to find that there was a material breach, the departure from the terms of the contract or defects of performance must have pervaded the whole of the contract or have been so essential as substantially to defeat the object that the parties intended to accomplish. *Miller v. Benjamin*, 142 N.Y. 613, 617, 37 N.E. 631 (Ct.App.1894). Moreover, "[t]he right of a party to enforce a contract will not be forfeited or lost by reason of technical, inadvertent, or unimportant omissions or defects." *Id.*

In this case, it is uncontested that, as of April 3, 1993, Cablevision was free to raise the rates for the Family Cable tier without prior Town approval. That Cablevision raised its rates on April 1, 1993—a mere two days in advance of the effective date of the Act—is certainly insignificant in light of the nine-year duration of the franchise (*see* Fr. Agmt. at § 4), and the effect of the breach on the "whole of the contract" is negligible. *See Miller*, 142 N.Y. at 617, 37 N.E. 631. Indeed, the Town has not asserted, in other than conclusory fashion, that the premature increase defeated any objective of the Franchise Agreement. *See id.* The Court thus finds that "[t]he deviation from the contract occurred in such a way, and was of such a character, that it did not, as a matter of law, amount to" a material breach of the contract. *See id.* Revocation of the franchise on the ground that Cablevision increased its rates

for the Family Cable tier was, therefore, inappropriate.[11]

### C. *Elimination of the Grandfathered Tier*

■ As a final ground for revocation of the franchise, the Town contends that the elimination of the Grandfathered tier violates Section 17(d) of the Franchise Agreement, which provides that Cablevision "shall not abandon any service or portion thereof without the written consent of the municipality." In response, Cablevision first submits that it did not violate Section 17(d).

The Court is unable, however, on this motion for summary judgment, to determine whether Cablevision has violated Section 17(d) of the Franchise Agreement. The terms of this Section, which prohibit any "abandonment of service," are ambiguous, and neither of the parties has submitted evidence to support its interpretation of this Section.[12] *See Mellon Bank, N.A. v. United Bank Corp. of New York*, Nos. 93–9358, 1752, 1994 WL 416159, at *2, 31 F.3d 113 (2d Cir.1994) ("Summary judgment is only proper in contract disputes if the language of the statute is ' "wholly unambiguous." ' ") (quoting *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985)) (further citation omitted).

Cablevision contends, however, that even if it has violated Section 17(d), and has "abandoned service" by eliminating the Grandfathered tier, the violation does not permit the Town to revoke Cablevision's franchise, for, to the extent that Section 17(d) prohibits such an action, it is preempted by Section 544 of the 1984 and 1992 Cable Acts.

The 1984 Act provides, generally, that "[a]ny franchising authority may not regulate the services ... provided by a cable operator except to the extent consistent with this subchapter." 47 U.S.C. § 544(a). The remainder of the Act only permits franchising authorities "to enforce any requirements contained within the franchise ... for *broad categories* of video programming or other

11. In reaching this conclusion, the Court does not express an opinion on the availability of other potential methods of recourse by the Town, such as a suit for money damages.

12. The Court notes, however, that it does not appear that, in restructuring the tiers of service, Cablevision "abandoned" any category of programming. *See infra* at 886.

services." [13] *Id.* at § 544(b)(2)(B) (emphasis added). These provisions were not amended by the 1992 Cable Act, and remain in effect.

As one court has explained, "[j]udicial interpretation of 'broad categories of video programming' is sparse." *Jones Intercable v. City of Stevens Point,* 729 F.Supp. 642, 648 (W.D.Wis.1990). Indeed, neither this Court nor the parties to the action have located any reported cases applying Section 544 to a cable operator's restructuring of its tiers of service.

The cases that have interpreted Section 544, however, provide some guidance, in that they offer an indication of the extent to which Congress intended to allow franchising authorities to enforce contract provisions regarding programming and services. For example, these cases explain that franchising authorities may enforce requirements regarding the provision of regional programming, *see id.* at 648 (upholding franchise authority's requirements for "east coast programming"), or local programming, *see Chicago Cable Communications v. Chicago Cable Comm'n,* 678 F.Supp. 734 (N.D.Ill.1988) (upholding franchise provision requiring programming originating in the Chicago area), *aff'd,* 879 F.2d 1540 (7th Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 839, 107 L.Ed.2d 835 (1990), for such provisions regulate "broad categories" of programming, as defined in the Act. The cases also reveal, however, that franchising authorities are precluded from enforcing franchise requirements that usurp the cable operator's power to determine the details and particulars of the provision of cable service. *See Jones Intercable,* 729 F.Supp. at 649.

In light of the rationale of these cases, the Court finds that, in attempting to prevent the elimination of the Grandfathered tier, the Town is not seeking to regulate any "broad category" of programming or services. To the contrary, the Town is impermissibly seeking to control the particulars of the provision of cable service. The elimination of the Grandfathered tier does not affect any broad category of programming or services, for all of the channels previously offered on the Grandfathered tier remain available on the Family Cable tier. (Pls.' Oct. 5, 1993 Mem. at 22, 24.) Cablevision merely restructured the manner in which its programming was packaged. Under the Cable Act, the Town has no authority to regulate such a particular as the manner in which Cable service is packaged for the Consumer.

The Court's conclusion that such regulation is improper is supported by the legislative history of Section 544(b)(2)(B), which provides that

> [t]he Committee does not intend by this provision to give franchising authorities . . . the authority to require the cable operator to offer certain program services *or service packages.*

H.R.Rep. No. 934, 98th Cong., 2d Sess. 19, 69, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4706.

Thus, applying the rationale of these cases and the legislative history of the Act to the facts of this case, the Court finds that, to the extent that Section 17(d) requires the continued provision of the Grandfathered tier, the Section is preempted by the 1984 and 1992 Cable Acts.

 Interestingly, in its most recent submissions to this Court, the Town appears to have retreated from its position that the elimination of the Grandfathered tier constitutes an "abandonment" of service, and instead characterizes the elimination as an impermissible "rate increase" for those subscribers who had been "grandfathered." [14] However, as explained above, under the 1992 Cable Act, the Town is prohibited from regulating rates for service tiers other than the

---

13. Cablevision also relies upon the general preemption provision of the statute, which provides that "any provision of any franchise . . . which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c).

14. Upon its elimination, subscribers to the Grandfathered tier were automatically switched to the Family Cable tier, unless they opted otherwise. The rate for the Family Cable tier is $20.90 per month, whereas the rate for the Grandfathered tier had been $17.75 per month.

Basic tier.[15] *See supra* at 883–84. Although the elimination of the Grandfathered tier on March 15 and its concomitant rate increase occurred two weeks prior to the effective date of the Act, the Court finds that, in light of the term of the franchise and the negligible effect on the contract as a whole, Cablevision's actions do not constitute a material breach of the Franchise Agreement. *See supra* at 884–85. The elimination of the Grandfathered tier, therefore, was not an appropriate ground for revocation of the franchise.

### III. *Modification of the Franchise Agreement*

Having determined that certain provisions of the Franchise Agreement are preempted by the 1992 Cable Act, and that whatever breaches of contract Cablevision may have committed did not rise to the level of materiality to justify revocation of the franchise, the Court next considers Cablevision's "Request for Modification" of the Agreement so as to bring it into compliance with federal law.[16] The 1992 Cable Act provides that

> [d]uring the period a franchise is in effect, the cable operator may obtain from the franchising authority modifications of the requirements in such franchise ... for services, if the cable operator demonstrates that the mix, quality, and level of services required by the franchise at the time it was granted will be maintained after such modification.

47 U.S.C. § 545(a)(1)(B). The Act further provides that when such a request has been denied by a "final decision of a franchising authority," the cable operator may seek modification of the franchise by commencing an action in the district court. *Id.* at §§ 545(b)(1), 555(a)(1). In reviewing a request for modification of services, "the court shall grant such modification only if the cable operator demonstrates to the court that the mix, quality, and level of services required by the franchise at the time it was granted will be maintained after such modification." *Id.* at § 545(b)(3).

In its Findings of Fact and Conclusions of Law dated April 1, 1994, the Town denied Cablevision's Request for Modification of the Franchise Agreement, on three grounds: (1) that any request for modification should have been made prior to implementing any changes in service; (2) that Cablevision's actions were in violation—rather than compliance with—federal law; and (3) that Cablevision had not made "the requisite showing that the mix, quality and level of services required by the franchise at the time it was granted will be maintained after such modification." (Town Board's April 1, 1994 Findings of Fact at ¶¶ 26–31.) Because the Town has issued a "final decision" in this regard, the Court may address Cablevision's modification request.

█ The Court first addresses the Town's contention that the Request for Modification was not timely made. The Town contends that because Section 545 provides that the cable operator must demonstrate that "the mix, quality, and level of services *will be* maintained after such modification," requests for modification of franchise obligations must "precede, not follow, changes in cable service." (Defs.' Oct. 27, 1993 Mem. at 6 (quoting 47 U.S.C. §§ 545(a)(1)(B), (b)(3) (emphasis added)).)

The question before the Court is not whether Cablevision was required to seek permission to modify its franchise obligations before implementing changes, but rather

---

**15.** Indeed, to the extent that Section 17(d) would operate as a prohibition against a rate increase for subscribers to the Grandfathered tier, the Section is preempted by the 1992 Cable Act. To hold otherwise would permit franchising authorities to circumvent the Act's prohibition on rate regulation by invoking their authority to require the continuation of specific tiers of service at previously established rates. Such a result would be impermissible in light of the Court's duty to construe a statute to give full effect and meaning to all of its provisions. *See Allen Oil Co., Inc. v. Commissioner of Internal Revenue,* 614 F.2d 336, 339 (2d Cir.1980).

**16.** The Court notes that, according to the preemption provisions of the 1992 Cable Act and the Franchise Agreement itself (*see* 47 U.S.C. § 556(c); Fr.Agmt. at § 27(b)), to the extent that any Franchise provisions are inconsistent with federal law, they are automatically preempted and "modified." Nonetheless, the Court addresses the issue of modification under the procedures set forth in Section 545, in order to ensure that the requirements of the 1992 Cable Act will be appropriately implemented.

whether its failure to do so is a legitimate ground to deny a modification request made after the fact. As to that question, and that issue, the Town's argument is unpersuasive. The only time constraint placed upon a request for modification is that it be made "during the period [the] franchise is in effect." *Id.* at § 545(a)(1)(B). The language upon which the Town relies merely explains what the cable operator must demonstrate in order to succeed on its request; the Court does not believe that this language was intended to indicate when such a request must be made. Thus, based upon the Court's reading of Section 545, the Court finds that, although made after the change in services, Cablevision's Request for Modification was timely filed in the sense that it had a right to have the application determined on its merits.[17]

The Town's second ground for denying modification of the contract is that Cablevision's changes in service violated federal law. As explained above, however, Cablevision's introduction of the Broadcast Basic tier and its elimination of the Grandfathered tier were in keeping with the requirements of federal law.[18] *See supra* at 881–83, 885–87. Thus, the second ground advanced by the Town is likewise meritless.

■ Finally, the Town contends, without explanation, that Cablevision has failed to demonstrate that the mix, quality, and level of services required by the franchise at the time it was granted will be maintained after modification. The Court disagrees. Neither the establishment of Broadcast Basic tier nor the elimination of the grandfathered tier altered the number or categories of channels offered to subscribers.[19] Thus, to the extent that the provisions of the Franchise Agreement prohibit such a retiering, the Agreement is modified so as to come into compliance with federal law.

## IV. *Injunctive Relief*

■ To obtain a permanent injunction, the moving party must demonstrate: (1) that in the absence of injunctive relief, it will suffer irreparable harm; and (2) actual success on the merits. *See Amoco Prods. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987); *Francis S. Denney, Inc. v. I.S. Labs., Inc.*, 758 F.Supp. 140, 143 (S.D.N.Y.1990).

■ As demonstrated by the foregoing discussion, Cablevision has satisfied the second requirement for the issuance of a permanent injunction. As to the first requirement, that Cablevision will suffer "irreparable harm," Cablevision must demonstrate that its injuries cannot be compensated by money damages. *See Reuters Ltd. v. United Press Int'l*, 903 F.2d 904, 907 (2d Cir.1990) (citations omitted). Because, in this case, money damages, as a matter of law, are not available, Cablevision has also satisfied the first requirement for injunctive relief.

Section 555a of the 1992 Cable Act provides in pertinent part:

(a) Suits for damages prohibited

In any court proceeding pending on or initiated after October 5, 1992, involving

---

17. This interpretation of the statute is supported by the case of *Tribune–United Cable v. Montgomery County*, 784 F.2d 1227 (4th Cir.1986). In *Tribune–United*, the franchise authority notified the local cable operator that it was in breach of its franchise agreement for failure to comply with various technological requirements of the agreement, including the unauthorized substitution of certain equipment. After receiving notification of the breach, the cable operator sought to modify the franchise agreement. In holding that the franchise authority could not invoke any of the agreement's penalty provisions pending resolution of this valid request for modification, the Fourth Circuit nowhere suggested that the request was untimely, in that it was filed after unauthorized changes in the system had been effected.

18. Because the Town apparently does not contend that, under the Franchise Agreement or the 1992 Cable Act, it has the authority to regulate rates for the Family Cable tier and the formerly "grandfathered" subscribers, the Court need not address Cablevision's request for modification in this regard.

19. Again, because any Franchise provision prohibiting the establishment of Broadcast Basic or the elimination of the Grandfathered tier would be preempted by federal law, the agreement is automatically "modified." *See supra* note 16. Thus, even if the "mix, quality, and level" of cable services had been altered by these actions, rejection of the modification request would be inappropriate.

any claim against a franchising authority ... arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

Given this statutorily-created prohibition on damages,[20] coupled with the fact that the Town may not legitimately implement its revocation decision of April 1, 1994, Cablevision is entitled to injunctive relief in this case. Accordingly, the defendants are enjoined from revoking its Franchise Agreement, as modified, with Plaintiffs.

### Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted, and Defendants' motion for summary judgment is denied.

More particularly, the Court finds, as a matter of law, that:

(1) Plaintiffs did not materially breach the franchise agreement;

(2) Defendants' decision of April 1, 1994, to revoke the franchise was improper as contrary to law; and

(3) as the requested modifications of the Franchise Agreement are consistent with the provisions of the 1992 Cable Act, Plaintiffs' Request for Modification should have been granted by Defendants, and is granted by the Court.

In addition to the above declaratory relief granted to Plaintiffs, Defendants are hereby enjoined from taking any steps to implement their April 1, 1994 decision to revoke the franchise.

Summary judgment having been granted to Plaintiffs, it appears that no outstanding issues remain for trial. Accordingly, the Court's file in this matter will be closed, unless either or both counsel indicate to the Court, in writing, on or before November 1, 1994, that one or more issues remain for resolution.

SO ORDERED.

---

**20.** Although the term "revocation" does not explicitly appear in Section 555a), the Court finds that a franchising authority's decision to revoke a franchise "aris[es] from the regulation of cable service," and, as such, is within the ambit of the Section's prohibition on money damages.