TOWN OF NORWOOD & another[1] vs. ADAMS-RUSSELL CO., INC.

Norfolk. December 7, 1989. - February 8, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Community Antenna Television Systems. Federal Preemption. Municipal Corporations*, Contracts. *Consumer Protection Act*, Unfair act or practice. *Words*, "Regulation."

A rate freeze provision in a franchise contract between a town and the operator of the cable television system in the town constituted a "regulation" within the meaning of § 543 of the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521-559 (Supp. III 1984) (Cable Act), which permitted a franchising authority, such as the town, to regulate the rates for "basic cable service," but only until December 29, 1986, and consequently the Cable Act preempted the authority of the town to enforce the rate freeze beyond December 29, 1986, despite the fact the freeze took the form of a bilateral, time-limited contract provision rather than of a unilateral, permanent ordinance. [607-613]

Summary judgment was properly entered in favor of the operator of the cable television system in a town on the town's claim that a certain rate increase by the operator constituted an unfair or deceptive business practice in violation of G. L. c. 93A, § 11. [613-614]

CIVIL ACTION commenced in the Superior Court Department on August 28, 1985.

Following remand by this court, 401 Mass. 677 (1988), motions by the plaintiffs for a remedy and to amend their complaint, and cross motions for summary judgment were heard by *James P. Lynch, Jr.*, J.

The Supreme Judicial Court granted a request for direct appellate review.

[1]The board of selectmen of Norwood.

*Bruce A. Singal* (*Robert Wolkon* with him) for the plaintiffs.

*Mark J. Tauber* of the District of Columbia & Michael A. Collora for the defendant.

GREANEY, J. In July, 1982, the town of Norwood granted a license to Adams-Russell Co., Inc. (Adams-Russell), authorizing it to construct and operate a cable television system in the town. That license, which took the form of a bilaterally negotiated contract, contains a rate freeze provision providing as follows: "The Licensee [Adams-Russell] agrees that it will not change the schedule of monthly rates for all cable and pay TV services for at least twenty-four (24) months after the cable system is initially fully constructed and energized."[2]

The event underlying the town's complaint in this case occurred in August, 1985, when Adams-Russell announced a rate increase on its "Supercable" service, effective on September 1, 1985.[3] It is undisputed that Adams-Russell had not, and in fact still has not, completed construction of the cable system in accordance with the requirements set forth in the license.

In August, 1985, the town and its board of selectmen filed a two-count complaint against Adams-Russell in the Superior Court. Count one alleged that Adams-Russell had violated the rate freeze provision in the license agreement by raising its rates prematurely. Count two alleged that this rate increase also constituted an unfair or deceptive business practice in violation of G. L. c. 93A, § 11 (1988 ed.).

On November 17, 1986, a judge sitting in the Superior Court allowed the town's motion for summary judgment on count 1, but deferred any ruling on the proper remedy under that count or on liability under count 2. Adams-Russell appealed. In *Norwood* v. *Adams-Russell Co.*, 401 Mass. 677

[2]The provision also sets forth the procedure which Adams-Russell must follow to obtain a certificate of completion from the town. The specifics of that procedure are not material to this case.

[3]The Supercable rate was increased from $7.50 to $14.50 per month.

(1988) (*Norwood I*), we affirmed the grant of partial summary judgment for the town. In reaching this decision, we rejected Adams-Russell's argument that the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521-559 (Supp. III 1984) (Cable Act), preempted the rate freeze provision to the extent of rendering Adams-Russell's September 1, 1985, rate increase legal. The pertinent part of the Cable Act permits a franchising authority, such as the town, to regulate the rates for "basic cable service," but only until December 29, 1986. See 47 U.S.C. § 543(c)(1).[4] Any other type of rate regulation is prohibited. See 47 U.S.C. § 543(a). We concluded that Adams-Russell's Supercable tier constituted "basic cable service," and thus could be regulated by the town, pursuant to § 543(c)(1) of the Cable Act, until December 29, 1986. See *Norwood I*, *supra* at 684. Since the proposed rate increase occurred before that date, and violated the terms of the license agreement, we affirmed the Superior Court's judgment and remanded the case to that court for "further proceedings consistent with this opinion." *Id.* at 686.

On remand, the town moved for an appropriate remedy under count 1 and for summary judgment on count 2 (c. 93A claim). Furthermore, the town moved to amend both counts of its complaint to account for a second rate increase effective July 1, 1988. Adams-Russell sought to confine recovery under count 1 to damages incurred prior to December 29, 1986,[5] filed a cross motion for summary judgment on count 2, and opposed the motion to amend the complaint.

On November 17, 1988, a judge in the Superior Court agreed with Adams-Russell's position. The judge concluded that the case was an appropriate one for summary judgment,

---

[4]Specifically, such regulation may continue "until the end of the 2-year period beginning on [the] effective date [of this subchapter]." 47 U.S.C. 543(c)(1). The effective date of the subchapter is December 30, 1984. See Pub. L. No. 98-549, § 9(a) (Oct. 30, 1984).

[5]Adams-Russell contends that this limitation is required by our holding in *Norwood I*. The town, on the other hand, contends that no such limitation is expressed in, or may be implied from, our *Norwood I* opinion.

but that the town's remedy under count 1 was limited to losses incurred prior to December 29, 1986. Accordingly, the judge determined that Adams-Russell was required to refund the rate increases charged between September 1, 1985, and December 29, 1986, and denied the town's motion to amend its complaint to include the July 1, 1988, rate increase. The judge also decided that the town could not maintain its action under G. L. c. 93A, § 11, and thus granted summary judgment for Adams-Russell on count 2 of the complaint. The town has appealed from the judgment entered pursuant to the judge's memorandum. We granted the town's motion for direct appellate review, and now affirm the judgment.

1. *Preemption and the contract claim.* We first take up the issue of whether the Cable Act preempts the town's ability to enforce the rate freeze provision in the contract beyond December 29, 1986. In determining whether the rate freeze provision of the franchise agreement between the town and Adams-Russell is preempted by the Cable Act, we inquire whether Congress intended such preemption to occur. See *Cablevision of Boston Ltd. Partnership* v. *Flynn,* 710 F. Supp. 23, 26 (D. Mass. 1989), aff'd per curiam, 889 F.2d 337 (1st Cir. 1989); *New York* v. *FCC,* 814 F.2d 720, 724 (D.C. Cir. 1987), aff'd, 486 U.S. 57 (1988). Our inquiry on this point is resolved by the plain language of the statute: "Except as provided in section 557 of this title . . . any provision of any franchise granted by [a franchising] authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. § 556(c).[6] Section 557 in turn provides that provisions of licenses which predated the enactment of the Cable Act shall remain in effect "subject to the express provisions of this subchapter." 47 U.S.C. § 557(a). The Cable Act preempts only those franchise provisions which are inconsistent with its terms, and has been so interpreted by other courts which have addressed this issue. See *Cablevision of Boston Ltd. Partner-*

[6]There is no dispute that the town is a "franchising authority" as defined in the Cable Act. See 47 U.S.C. § 522(9).

*ship* v. *Flynn*, *supra* at 28. See also *Housatonic Cable Vision* v. *Department of Pub. Util.*, 622 F. Supp. 798, 806 (D. Conn. 1985); *Dubuque* v. *Group W Cable, Inc.*, No. C 85-1046 (N.D. Iowa June 18, 1986). The rate freeze provision will conflict with the Cable Act, and thus be preempted thereby, only if the provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Jones* v. *Rath Packing Co.*, 430 U.S. 519, 526 (1977).

Adams-Russell contends that the rate freeze provision conflicts, within the meaning of the *Jones* decision, *supra*, with § 543 of the Cable Act. That section provides, in pertinent part, that "[a]ny franchising authority may regulate the rates for the provision of cable service . . . but only to the extent provided under this section." 47 U.S.C. § 543(a). Thus, a franchising authority may not regulate rates unless an express exception is provided for in § 543 of the Cable Act. See *Dubuque* v. *Group W Cable, Inc.*, *supra*. Section 543 provides for two such exceptions; a franchising authority: (1) may "regulate rates for the provision of basic cable service in circumstances in which a cable system is not subject to effective competition," § 543(b); and (2) may enforce franchise provisions regulating basic cable service which antedate the enactment of the Cable Act for a two-year period following that enactment, § 543(c)(1).[7]

Adams-Russell argues that the town cannot avail itself of the first exception because the town's cable system is subject to effective competition. Furthermore, argues Adams-Russell, while the second provision does permit the town to enforce the rate freeze, that permission extends only until the expiration of the two-year grandfather clause period — which ended on December 29, 1986. Thus, Adams-Russell contends that any attempt to enforce that provision beyond December

---

[7]We held in *Norwood I*, *supra* at 684, that Adams-Russell's Supercable service, the service at issue here, constitutes "basic cable service" within the meaning of the Cable Act.

29, 1986, conflicts with the Cable Act and consequently is preempted.

The town, on the other hand, maintains that to enforce the rate freeze provision is not to "regulate rates" within the meaning of the Cable Act, and thus is not covered by the Act's preemption provisions. In support of this position, the town relies on the facts that the rate freeze provision (1) was enacted through bilateral contract negotiations rather than as a unilateral ordinance; (2) is time limited rather than permanent; and (3) was initially proposed by Adams-Russell rather than by the town. The town apparently concedes, as it must, that, if the rate freeze provision constitutes "regulation," it cannot be enforced beyond December 29, 1986.

While clearly prohibiting certain rate regulation by franchising authorities, the Cable Act does not define the term "regulation." We therefore must examine the Act's legislative history to determine what meaning Congress attached to that term. A convenient starting point in this analysis is the problem that prompted the Cable Act's enactment: "Faced with stiff competition for franchises, some cable operators simply overpromised and oversold in the franchise process." H.R. Rep. No. 934, 98th Cong., 2d Sess. 21, reprinted in 1984 U.S. Code Cong. & Admin. News 4655, 4658. As a result of this overreaching, recognized Congress, "[t]he past two to four years have shown that, in many instances, the terms of the urban franchises may be beyond the point of economic viability. . . . In major cities across the country, cable operators have soon after the grant of a franchise turned to the city with requests to reduce channel capacity from that bid in the franchising process, cut back on the services provided, reduce public access facilities, increase rates and slow down the timetable for construction." *Id.* at 4658-4659. The resolution of this problem in the franchising process is expressly identified as a "significant purpose" for passing the Cable Act. *Id.* at 4659.

The specific solution legislated in the Cable Act is deregulation. With the discrete exceptions noted above, cable rates are to be determined by the forces of marketplace competi-

tion rather than by municipal fiat, bilateral contract, or any other nonmarket mechanism. See *id.* at 4662 ("The [House Energy and Commerce] Committee believes that the availability of competing sources of programming in a given market will keep the rates for basic cable services reasonable in that market without the need for regulation. A franchising authority should be granted authority to regulate rates for basic cable service only in circumstances in which a cable system is not subject to effective competition"); S. Rep. No. 67, 98th Cong., 1st Sess. 23 ("The [Senate Committee on Commerce, Science, and Transportation] firmly believes in encouraging competition and in not imposing any regulation where marketplace forces are better able to insure innovation, diversity, and efficiency. . . . [I]t is the intent of this committee that [telecommunications] services, when offered over a cable system, shall be free of any governmental regulation or restriction"). This congressional intent is clearly reflected in the Cable Act itself. After the two-year grandfather period has elapsed, the sole basis upon which franchising authorities may regulate basic cable service is the absence of effective competition in the marketplace. See 47 U.S.C. § 543; *Westwood* v. *Adams-Russell Co.*, 24 Mass. App. Ct. 914, 916 (1987).

The interpretation of the term "regulation" proposed by the town is in direct conflict with the unambiguous, pro-competitive intent manifested in the Cable Act. The town's attempt to enforce its rate freeze provision beyond December 29, 1986, has the pronounced effect of perpetuating the problem Congress set out to resolve in the Cable Act — the setting of rates through the often economically unviable franchise process. Were we to adopt the town's position, we would be insulating the basic cable rates in that town from market competition, and for a potentially indefinite term.[8] Such an interpretation would run directly counter to both

---

[8]Under the rate freeze provision, Adams-Russell may not raise rates for two years following the completion of the town's cable system as provided in the license, an event which might never occur.

congressional intent and the express language of the Cable Act.

Our conclusion on this point is reinforced by the complete absence in either the language or the legislative history of the Cable Act of evidence which supports the town's attempt to remove its bilaterally negotiated rate freeze provision from the Act's proscription of "regulation." On the contrary, the language of the Cable Act indicates that Congress fully intended the Cable Act's reach to extend to rate regulation taking the form of a contract. The Act defines the term "franchise" as "an initial authorization . . . issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, *contract*, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system" 47 U.S.C. § 522(8) (emphasis added). Congress thus was clearly aware that rate regulations in cable television franchises sometimes take the form of contractual provisions. Yet nowhere did Congress indicate that the effects of such rate regulations were any less pernicious simply because they were drafted as terms of a contract rather than as local ordinances, or any other type of unilaterally imposed regulation. Having reviewed the terms of the Cable Act, as well as its legislative history, we are convinced that Congress did not intend to draw any distinction between the various technical forms a rate regulation might take. In fact, ascribing to Congress any such intent would be simultaneously to ascribe to it an intent to permit the circumvention of the Cable Act itself. As the Supreme Court of Vermont has astutely noted, a franchising authority "cannot avoid the Act's clear prohibitions of regulation by arguing that it achieved rate control only through 'proprietary' means. Otherwise, governmental subdivisions could use threats of market competition to obtain de facto rate regulation through contractual settlements, thus avoiding the dictates of the Act."[9] *Burlington* v. *Mountain Cable Co.*, 559

---

[9]Any doubt which might remain regarding the compatibility of the town's position with the Cable Act is erased by the fact that the Senate

A.2d 153, 156 n.4 (Vt. 1988), cert. denied, 109 S. Ct. 3245 (1989).

We conclude that the rate freeze provision contained in the franchise contract between Norwood and Adams-Russell is a "regulation" within the meaning of § 543 of the Cable Act.[10] The fact that the freeze takes the form of a bilateral, time-limited contract provision rather than of a unilateral, permanent ordinance is irrelevant. Both types of restrictions frustrate the purposes of the Cable Act equally, and are

---

considered and rejected a proposed amendment to the Act which would have codified the town's view. That amendment, proposed by Senator Lloyd Bentsen, read as follows: "Notwithstanding any other provision of this Act, the provisions of this Act shall not be applicable to any franchise in effect on the date immediately preceding the date of the enactment of this Act." 129 Cong. Rec. S8275 (daily ed. June 13, 1983). Two aspects of this proposed amendment firmly convince us that the town's position cannot be correct. First, Senator Bentsen expressly stated that contractual rate freeze provisions — precisely what the town seeks to enforce here — could not be enforced absent the amendment. See id. at S8276 (statement of Sen. Bentsen) ("The city of Fort Worth, for example, negotiated a contract which called for the regulation of the first three tiers of service. *S.66, if enacted in its present form, would allow the cable company which wired Fort Worth the next day to raise the rates for the second two tiers of service.* I repeat: that is just not right.") (Emphasis added.) The Senator further noted that "S.66, in spite of many other good provisions, in this situation *represents a Congressional nullification of contractual obligations and commitments*" id. (emphasis added). Second, the proposed amendment was emphatically rejected. Senator Robert Packwood argued that "this amendment does one thing, [i]t guts the agreement in the bill between the National League of Cities and the cable television industry." 129 Cong. Rec. S8295-S8296 (daily ed. June 14, 1983). Senator Barry Goldwater's objection was similarly vehement: "If this amendment is taken, there is no need for a cable bill. . . . It would frustrate the principal goal of establishing a uniform policy for cable." *Id.* at S8296. The amendment was subsequently defeated in the Senate by a vote of seventy-nine to nineteen. See *id.* Any hope the town might have had of prevailing on this issue died with the Bentsen amendment.

[10]In view of our rejection of the town's theory on the basis of the Act's legislative history, we are not persuaded by the town's arguments premised on secondary sources, such as the state of cable television regulation and decisions of the Federal Communications Commission at the time of the Act's enactment.

therefore equally preempted thereby.[11] The town may not enforce the rate freeze provision after December 29, 1986.[12]

2. *The G. L. c. 93A claim.* We assume, without deciding, that the town in these circumstances has standing to sue under G. L. c. 93A, § 11. The foregoing discussion makes

[11]This conclusion is consistent with that reached by the Supreme Court of Vermont in *Burlington* v. *Mountain Cable Co.*, 599 A.2d 153, 155 (Vt. 1988) (enforcement of contractual rate freeze provision "would offend one of the essential purposes of the [Cable] Act").

The town has brought to our attention the decision of the United States Court of Appeals for the First Circuit in *Nashoba Communications Ltd. Partnership No. 7* v. *Danvers*, 893 F.2d 435 (1st Cir. 1990) and argues that the decision supports its position in the case. We do not agree. First, the court in *Danvers* decided only a narrow threshold jurisdictional issue, whether the District Court had Federal question jurisdiction to grant a declaratory judgment that Danvers' threatened State court action to enforce a rate freeze was preempted by the Cable Act. In deciding that such jurisdiction was absent, the First Circuit expressly recognized that State courts can decide Federal statutory questions of preemption. The First Circuit also recognized that the preemption issue in the case before it was an anticipatory defense to a State court contract action, and the First Circuit, accordingly, did not purport to pass on the merits of the defense. Thus, the language in *Danvers* on whether enforcement of a franchise is "regulation" is dictum which is irrelevant to this case. Second, we are particularly persuaded by the fate of the proposed Bentsen amendment, *supra* at note 9, that Congress indeed considered contractual rate freeze provisions, such as the one at issue in this case, to constitute "regulation" prohibited by the Cable Act in all but certain statutorily specified situations not applicable here.

[12]This conclusion was implicit in *Norwood I*, *supra* at 684, in the dispute between these two parties. We noted in that case that "the validity of Adams-Russell's claim that Congress had preempted the regulation of rates depends on whether Adams-Russell's 'Supercable' tier constitutes 'basic cable service, including multiple tiers of basic cable service.'" This passage illustrates that the answer to the question whether Adams-Russell's Supercable tier constituted "basic cable service" within the meaning of the Cable Act would be dispositive of the preemption issue. In other words, if Supercable constitutes "basic cable service," the franchise provision purporting to freeze Supercable rates is preempted by the Cable Act and therefore must constitute "regulation." This point is further evinced by our conclusion that "[u]nder the grandfather clause of the Cable Act, the town was able to regulate the rates for the Supercable tier until December 29, 1986 . . . ." *Id.* Not only did we expressly refer to the town's ability to "regulate the rates," but we also based this statement on the authority conferred in the grandfather clause, 47 U.S.C. § 543(c)(1), which is entirely inapposite unless rate regulation is involved.

clear that Adams-Russell has committed no violation of G. L. c. 93A, a conclusion further supported by the Cable Act itself.[13]

*Judgment affirmed.*

---

[13]Section 552(c) of the Cable Act, which deals with consumer protection laws, provides as follows: "Nothing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, *to the extent not inconsistent with this subchapter*" (emphasis added). The meaning of the italicized language is clearly indicated in the legislative history discussing that section of the Cable Act. "A state or franchising authority may not, for instance, regulate the rates for cable service in violation of [§ 543], and attempt to justify such regulation as a 'consumer protection' measure." H.R. Rep. No. 934, 98th Cong. 2d Sess. 79, reprinted in 1984 U.S. Code Cong. & Admin. News 4655, 4716. The town is attempting to do precisely what § 552(c) prohibits.