[No. A071263. First Dist., Div. Two. Feb. 27, 1997.]

CHRISTOPHER MORRISON et al., Plaintiffs and Appellants, v. VIACOM, INC., et al., Defendants and Respondents.

**COUNSEL**

Joseph M. Alioto, John H. Boone, Michael Dietrick and Jon P. Rankin for Plaintiffs and Appellants.

George Shapiro, David M. Balabanian, Terry J. Houlihan, Christopher B. Hockett and Stephanie S. Lamarre for Defendants and Respondents.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

The question presented by this appeal is whether provisions of California's antitrust law prohibiting anticompetitive "tying" practices are preempted by federal law regulating the cable television industry. The trial court found that appellants' state law antitrust claims against a cable operator were preempted and sustained a demurrer to their complaint, without leave to amend. We disagree and reverse the judgment.

## II. STATEMENT OF FACTS

On September 22, 1994, appellants filed an antitrust action against respondent, Viacom, Inc., seeking damages and injunctive relief. Appellants are alleged representatives of a class consisting of all persons who have purchased cable television services in San Francisco or Marin County from respondent during the four years prior to the filing of their complaint. The complaint charges respondent with violating California's Cartwright Act by restraining trade in the San Francisco and Marin county markets for cable television services.

According to the complaint, respondent offers customers three distinct categories of services: (1) broadcast channels, consisting of local television channels concurrently available over the noncable airwaves without charge, such as KGO, KPIX and KRON; (2) satellite cable channels, consisting of geographically remote broadcast television channels and nonbroadcast channels such as CNN and ESPN; and (3) premium channels, consisting of nonbroadcast channels such as HBO and Showtime.

Appellants allege that respondent has unlawfully restrained trade in violation of Business and Professions Code sections 16720 and 16727 (the Cartwright Act) by illegally tying the sale of satellite channels to the sale of broadcast channels and the sale of premium channels to the sale of both broadcast and satellite channels. In other words, appellants complain that respondent has illegally restrained trade by making the purchase of broadcast channels a prerequisite for the purchase of satellite cable channels and by making the purchase of both broadcast channels and satellite cable channels a prerequisite for the purchase of premium channels.

Respondent demurred to the complaint, arguing that appellants failed to state a cause of action because the antitrust claims alleged in the complaint are preempted by provisions of the Cable Television Consumer Protection and Competition Act of 1992 (Pub.L. No. 102-385 (Oct. 5, 1992) 106 Stat. 1460, 1992 U.S. Code Cong. & Admin. News, No. 1) (the 1992 Cable Act), and the Cable Communications Policy Act of 1984 (Pub.L. No. 98-549 (Oct. 30, 1984) 98 Stat. 2779, codified in part at 47 U.S.C.A. § 521 et seq.) (the 1984 Cable Act). Respondent argued that its practice of offering customers several "tiers of service" is required by federal law and that, in any event, states are expressly prohibited by the cable acts from regulating rates charged by cable operators.

On July 12, 1995, the trial court sustained respondent's demurrer without leave to amend. Judgment was entered on August 21, 1995. Appellants timely appealed.

### III. Discussion

Appellants contend the trial court erred by sustaining the demurrer to their complaint; they argue the complaint states valid causes of action because the 1984 and 1992 Cable Acts do not preempt their state Cartwright Act claims. When reviewing a judgment based on an order sustaining a demurrer without leave to amend, we accept as accurate the factual allegations of appellants' complaint. (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 165 [65 Cal.Rptr. 297, 436 P.2d 297].) If the complaint states a cause of action, the judgment must be reversed. (*Black* v. *Browne* (1940) 39 Cal.App.2d 606, 607-608 [103 P.2d 1012].)

### A. *The Preemption Doctrine*

■ The preemption doctrine derives from the supremacy clause, which declares that the "laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, § 2.)

"Whether federal law preempts state law 'fundamentally is a question of congressional intent . . . .' [Citations.]" (*Smiley* v. *Citibank* (1995) 11 Cal.4th 138, 147 [44 Cal.Rptr.2d 441, 900 P.2d 690], affd. __ U.S. __ [116 S.Ct. 1730, 135 L.Ed.2d 25].) When addressing a preemption question, we " 'start[] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407]; see also *Smiley* v. *Citibank, supra,* 11 Cal.4th at p. 148.) "Therefore, courts should proceed on 'the conviction that the proper approach is to reconcile the operation of both statutory schemes with one another rather than holding one completely ousted.' " (*Storer Cable Com.* v. *City of Montgomery, Ala.* (M.D.Ala. 1992) 806 F.Supp. 1518, 1531, quoting *Merrill Lynch, Pierce Fenner & Smith* v. *Ware* (1973) 414 U.S. 117, 127 [94 S.Ct. 383, 389-390, 38 L.Ed.2d 348].)

Preemption may arise in three ways. " 'First, Congress can define explicitly the extent to which its enactments pre-empt state law.' [Citations.] 'Second, in the absence of explicit statutory language, state law is preempted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' [Citations.] 'Finally, state law is pre-empted to the extent that it actually conflicts with federal law.' [Citations.]" (*Smiley* v. *Citibank, supra,* 11 Cal.4th at p. 147.)

In the present case, the trial court found two types of preemption. First, it concluded that the anti-tying provisions of the Cartwright Act conflict with

federal law which compels cable operators to require customers to subscribe to a basic service tier as a prerequisite to providing access to other tiers of service (conflict preemption). Second, the court found that statutory provisions in the 1984 and 1992 Cable Acts prohibiting states from regulating cable company rates explicitly preempt the Cartwright Act claims at issue in this case (express preemption). In addition, respondent contends that the lower court's preemption ruling can be sustained under another provision of the cable acts which allegedly expressly precludes states from regulating cable operators' "tiering" decisions.

For the reasons that follow, we hold that the 1992 Cable Act preempts only a portion of appellants' claims and that neither act precludes appellants from stating a valid cause of action under the Cartwright Act. Therefore, the judgment must be reversed.

**B.** *The 1992 Cable Act Provision Requiring Subscription to a Basic Tier of Service for Access to Other Tiers of Service Conflicts With Only a Portion of the Cartwright Act Claims*

The trial court found that appellants' claims are preempted to the extent that they are based on conduct occurring after the enactment of 47 United States Code Annotated section 543(b)(7), of the 1992 Cable Act (section 543(b)(7)). Section 543(b)(7) states in relevant part: "Each cable operator of a cable system shall provide its subscribers a separately available basic service tier to which subscription is required for access to any other tier of service." (§ 543(b)(7)(A).)

■ Appellants have alleged that respondent violated the Cartwright Act by requiring customers to subscribe to its basic service tier in order to access other tiers of service. This part of the allegedly illegal conduct is expressly required by section 543(b)(7). Thus, it appears appellants' claims are partially preempted. Appellants contend, however, that section 543(b)(7) does not preempt any of their claims because this provision applies only to those cable companies that are regulated under the cable act and there is no evidence in the record that respondent is regulated.

Respondent half-heartedly disputes appellants' contention that only cable companies whose rates are regulated are subject to section 543(b)(7). Respondent cites no authority for its contention that all cable operators, whether regulated or not, are subject to section 543(b)(7). The only authority on the subject which has been brought to our attention states that section 543(b)(7) applies only to regulated companies. (See *Time Warner Entertainment Co., L.P.* v. *F.C.C.* (D.C. Cir. 1995) 56 F.3d 151, 192 [312 App.D.C.

187].) We are persuaded by the *Time Warner* court's interpretation of the relevant statute and agree with its conclusion that only regulated companies must comply with section 543(b)(7). (56 F.3d at p. 192.)

Respondent next claims that its San Francisco and Marin cable systems are regulated. Indeed, the trial court took judicial notice of documentation which establishes that respondent's San Francisco and Marin county operations are currently being regulated.[1] Nevertheless, the court's conclusion that appellants' claims are preempted by section 543(b)(7) to the extent they are based on conduct occurring after the enactment of that statute is erroneous in two important respects.

First, the trial court erred by using the date section 543(b) was enacted as the cutoff date for appellants' claims rather than determining when respondent actually became subject to regulation.[2] The documents of which the trial court took judicial notice do not establish when respondent became subject to rate regulation. Section 543(a)(2) of the 1992 Cable Act provides that "[i]f the Commission finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the Commission or by any State or franchising authority under this section." (47 U.S.C.A., § 543(a)(2).)[3] Thus, respondent was subject to rate regulation at all times that it was not subject to effective competition.

In its brief, respondent contends it was subject to "effective competition" "[f]rom September 22, 1990 (the starting date for the Complaint's allegations) through June 21, 1993 (when the Commission changed its effective competition regulations). . . ." We have not been directed to any factual evidence in the record to support this contention. But if it is correct, section 543(b)(7), the preemption provision relied on by both the trial court and respondent, could not have applied to respondent before June 21, 1993. In a petition for rehearing, however, respondent submits a new and different contention and asks us to rule as a matter of law that it was subject to effective competition (and hence not subject to rate regulation by anyone)

---

[1] At oral argument, appellant's counsel argued that while Viacom's San Francisco and Marin systems are subject to regulation, they are not currently being regulated. However, the documents of which the trial court took judicial notice indicate that both the San Francisco and Marin systems are currently being regulated. The documents include two Federal Communications Commission (FCC) opinions and orders resolving complaints about the prices respondent charged for cable programming service in Marin and in San Francisco.

[2] Even if section 543(b)(7) applies to nonregulated companies, as respondent contends, it would be error to focus on the enactment date of the statute as the trial court did in this case. Section 543(b) did not become effective until 180 days after its enactment. (See 47 U.S.C.A. § 543, Historical and Statutory Notes.)

[3] The substance of this provision was also contained in the 1984 Cable Act. (See 47 U.S.C.A. § 543(b)(1).)

only until the effective date of the 1992 Cable Act, April 3, 1992. We decline the invitation to so rule for at least two reasons: (a) the statute seems to suggest that a Commission finding is determinative of whether a cable system is or is not subject to "effective competition" (see § 543(a)(2)) and (b) bearing in mind the procedural posture of this case, we think the issue of the effective date of rate regulation is one best left to the trial court for consideration in the course of future proceedings.[4]

The trial court's second error was in concluding that all of appellants' claims are partially preempted by section 543(b)(7). By its own terms, section 543(b)(7) applies only to the provision of the "basic service tier," which in the present case would be respondent's tier of broadcast channels. But appellants' claims are not limited to the allegation that it is illegal to require customers to buy the basic service tier in order to obtain access to other tiers. Appellants also complain that respondent's practice of requiring a subscription to the basic *and* satellite cable tier in order to obtain access to the premium channels constitutes illegal tying. Section 543(b)(7) neither requires nor authorizes this latter practice. Indeed, section 543(b)(8) expressly prohibits a cable operator from requiring "the subscription to any tier other than the basic service tier . . . as a condition of access to video programming offered on a per channel or per program basis." (47 U.S.C.A. § 543(b)(8).)

In summary, although section 543(b)(7) may temporally and substantively limit the scope of appellants' claims, it does not preclude appellants from stating a cause of action for violation of California's Cartwright Act. Thus, section 543(b)(7) does not justify sustaining respondent's demurrer to the complaint.

C. *The Provision in the Cable Acts Prohibiting States From Regulating Rates Does Not Preempt the Cartwright Act Provisions Upon Which Appellants Rely.*

▮▮▮ The second ground for the court's ruling is that 47 United States Code Annotated section 543(a) of the 1984 and 1992 Cable Acts (section 543(a)), which precludes states from regulating cable company rates, preempts appellants' antitrust claims. The court reasoned that appellants' prayers for relief establish that they seek to regulate respondent's rates because appellants seek damages for allegedly *illegal rates* and also seek to enjoin respondent from charging *illegal rates* in the future.

---

[4]As noted above, during oral argument, appellants' counsel attempted for the first time to distinguish between companies that are regulated and companies that are subject to regulation. Whether this distinction is valid and relevant to the determination as to when respondent became subject to section 543(b)(7) (i.e., when it became subject to regulation or when it was actually regulated) is an issue the parties may address to the trial court, which has not yet had the opportunity to consider this matter.

Section 543(a)(1) of the 1992 Cable Act states that "[n]o Federal agency or State may regulate the rates for the provision of cable service except to the extent provided under this section and section 532 of this title." (§ 543(a)(1).) Section 543(a)(2) provides that a cable system which is subject to "effective competition" is not subject to rate regulation by "the Commission or by a State or franchising authority under this section." (§ 543(a)(2).) This section further provides that if a cable system is not subject to "effective competition" that system's rates for the provision of basic cable service shall be subject to limited regulation by the franchising authority and by the commission. (*Ibid.*) Prior to the enactment of the 1992 Cable Act, the 1984 Cable Act contained comparable statutory provisions severely limiting states' authority to regulate rates for the provision of cable services. (See 47 U.S.C.A. § 543(a)-(b).)

Appellants do not dispute that both cable acts preclude states from regulating cable rates. Rather, they contend that the anti-tying provisions of the Cartwright Act do not regulate rates. According to appellants, the antitrust laws are the antithesis of regulation in that their design and purpose is to promote competition and not regulation. Respondent, on the other hand, contends that using the Cartwright Act to regulate its "tiering" practices would directly affect how much it could charge customers, since rates are determined according to the tiering structure it has adopted. According to respondent, the cable acts preempt any state law, including antitrust laws, which necessarily affect cable rates.

Although both parties cite authority useful to our analysis, we have found no case which addresses the specific issue we face, i.e., whether the anti-tying provisions of the California Cartwright Act constitute rate regulation and are therefore preempted by the cable acts. We conclude that these provisions do not constitute direct rate regulation and that Congress has not expressed an intent to preempt all state regulation which indirectly affects rates charged by cable operators. Therefore, appellants' claims are not preempted by section 543(a).

1. *The Anti-tying Provisions Do Not Constitute Rate Regulation*

We employ respondent's proffered definition of rate regulation: a cable operator's "rate" is "the amount of money charged to subscribers to receive cable services." (*Storer Cable Com.* v. *City of Montgomery, Ala., supra,* 806 F.Supp. at p. 1543.) To "regulate" means "[t]o fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws." (Black's Law Dict. (6th ed. 1990) p. 1286, col. 1.) Thus, in the present context, a rate regulation is a law which fixes, establishes or controls the amount of money a cable operator

may charge subscribers for the provision of cable services. The Cartwright Act provisions upon which appellants rely, sections 16720 and 16727 of the Business and Professions Code, do not fall within this definition.

The purpose of the Cartwright Act is to protect and foster competition by preventing combinations and conspiracies which unreasonably restrain trade. (See *State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1153 [252 Cal.Rptr. 221, 762 P.2d 385]; *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) 238 Cal.App.2d 225, 238 [47 Cal.Rptr. 570].) Section 16720 of the Cartwright Act defines a "trust" as a "combination of capital, skill or acts by two or more persons" for numerous specified purposes including "(a) [t]o create or carry out restrictions in trade or commerce" and "(c) [t]o prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity." (Bus. & Prof. Code, § 16720.) Except as otherwise stated in the Cartwright Act, "every trust is unlawful, against public policy and void." (Bus. & Prof. Code, § 16726.)

Section 16727 of the Cartwright Act, which expressly prohibits illegal tying arrangements, states: "It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Bus. & Prof. Code, § 16727.)

■ Case law construing Business and Professions Code section 16727 defines a tying arrangement as " 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 856 [94 Cal.Rptr. 785, 484 P.2d 953]; *Kim* v. *Servosnax, Inc.* (1992) 10 Cal.App.4th 1346, 1360 [13 Cal.Rptr.2d 422].) Tying arrangements are illegal per se if the party has sufficient economic power and substantially forecloses competition in the relevant market. (*Ibid.*) Even when not per se illegal, a tying arrangement violates the Cartwright Act if it unreasonably restrains trade. (*Kim* v. *Servosnax, Inc., supra,* 10 Cal.App.4th at p. 1361.)

Neither the language of the Cartwright Act provisions at issue nor authority construing them indicates that the purpose or effect of those provisions is

to dictate or otherwise control what price a company, such as a cable operator, may charge for its services or goods. Instead, these provisions preclude agreements which restrain trade by conditioning the consumer's *access* to a product or service on his or her relinquishment of the freedom to choose *whether* to purchase another product or service. ▇ To the extent cable rates are affected at all by enforcement of these provisions, the effect is indirect at best.

That the state laws at issue are not designed to and do not directly regulate cable rates distinguishes the present case from most of the preemption cases upon which respondent relies. (*See Storer Cable Com.* v. *City of Montgomery, Ala., supra,* 806 F.Supp. at pp. 1542-1544 [preempting portion of local ordinance prohibiting cable companies from charging anticompetitive rates]; *Town of Norwood* v. *Adams-Russell Co.* (1990) 406 Mass. 604 [549 N.E.2d 1115] [preempting rate-freeze provision in contract between cable operator and franchising authority]; *Westmarc Com.* v. *Conn. Dept. of Public Utility* (D.Conn. 1990) 807 F.Supp. 876, 884-889 [state agency ruling providing that fine imposed on cable operator could not be passed on to cable subscribers constituted impermissible rate regulation]; *Cablevision Systems Corp.* v. *Town of East Hampton* (E.D.N.Y. 1994) 862 F.Supp. 875, 883-885 [recognizing that 1992 Cable Act limited franchising authority's power to regulate rates to regulation of basic service tier]; *Time Warner Entertainment Co.* v. *Briggs* (D.Mass. 1993) 1993 WL 23710, 3-4 [preempting local ordinance to the extent it regulated cable company rates]; *City of Dubuque* v. *Group W Cable, Inc.* (N.D.Iowa 1987) 1987 WL 11826, 4-7 [preempting cable franchise regulation of cable equipment rates]; *City of Gillette* v. *TCI Cablevision of Wyoming, Inc.* (D.Wyo. 1991) 1991 WL 329587 [preempting portions of city ordinances which overstepped franchising authority's power to regulate rates for cable services].)

Nevertheless, respondent contends the Cartwright Act provisions constitute rate regulation because applying these state law provisions to respondent's activities necessarily affects the rates it can charge. We reject this argument for two reasons. First, the anti-tying law does not preclude a cable operator from charging whatever rate it desires but only prohibits the operator from entering into an agreement which forces a customer to accept one service in order to obtain another. Thus, so long as access to services is not restricted in a way prohibited by the law, cable rates are not affected at all. Second, to the extent the anti-tying provisions have some indirect effect on cable company rates, we find insufficient evidence Congress intended to preempt those provisions.

### 2. *An Indirect Effect on Cable Rates Does Not Warrant Preemption*

In determining the scope of the cable acts' preemptive effect, we begin with the language of the federal statute; if that language is ambiguous we

consider the statute's legislative history. (See *Storer Cable Com.* v. *City of Montgomery, Ala., supra,* 806 F.Supp. at p. 1542; *Westmarc Com.* v. *Conn. Dept. of Public Utility, supra,* 807 F.Supp. at p. 885.) Here, section 543(a) of the 1992 Cable Act provides that no state "may regulate the rates for the provision of cable service" except as provided under the act, and that the "rates" for the "provision of basic cable service" and "for cable programming services" "shall not be subject to regulation" except under limited circumstances not relevant in this case. (§ 543(a)(1)-(2).) The 1984 Cable Act similarly restricted the states' power to "regulate the rates for the provision of cable services." (§ 543(a).)

The language used in both the 1992 and the 1984 versions of section 543(a) is not indicative of a congressional intent to extend the statute's preemptive effect so as to include all state regulation which might indirectly affect cable rates. (*Cable Television Ass'n* v. *Finneran* (2d Cir. 1992) 954 F.2d 91 (*Finneran*).) The *Finneran* court held that the provision of the 1984 cable act prohibiting states from regulating cable rates does not preempt state authority to regulate charges by cable operators to customers wishing to downgrade to a less expensive level of cable service. The court found that downgrade charges are not rates for the provision of cable services and, therefore, are not expressly preempted by the cable act. (*Id.* at p. 100.) The court also rejected the argument that regulation of downgrade charges was preempted because it would necessarily affect rates for the provision of cable services. The court was unable to discern a congressional intent to preempt regulations only indirectly affecting rates. (*Id.* at pp. 100-102.) The court based its ruling on, among other things, the language employed in section 543(a) which "fails to evince an intention to carve out a wide area free of state regulation." (954 F.2d at p. 101.)

As the *Finneran* court recognized, "[w]here Congress has intended to pre-empt all state laws affecting a particular subject, it has employed language well suited to the task." (*Finneran, supra,* 954 F.2d at p. 101.) Thus, for example, statutes which expressly preempt state regulations which "relate to" a given subject matter or field are indicative of an expansive preemptive intent. (*Ibid.*; see, e.g., *Morales* v. *Trans World Airlines, Inc.* (1992) 504 U.S. 374, 383-387 [112 S.Ct. 2031, 2036-2039, 119 L.Ed.2d 157] [finding that the term "relating to" indicates that a preemption clause is intended to have a broad reach].) The cable acts do not employ such broad language; they do not preempt state laws that "relate to" rate regulation. Rather the language employed suggests that ". . . Congress meant to preempt only those state rules that regulate rates charged by cable companies for providing services to customers." (*Finneran, supra,* 954 F.2d at p. 102.)

We conclude, as have courts construing both the 1984 and the 1992 Cable Acts, that the statutory language employed in the cable acts indicates that

Congress intended the preemptive scope of section 543(a) to be narrow. (See, e.g., *Finneran, supra*, 954 F.2d at p. 102; *Total TV* v. *Palmer Communications, Inc.* (9th Cir. 1995) 69 F.3d 298, 302, cert. dism. __ U.S. __ [116 S.Ct. 1459, 134 L.Ed.2d 576].) Thus, the cable acts prohibit states from directly regulating cable rates; they do not prohibit states from enforcing any law which may indirectly affect the rates any company may charge.

Our conclusion is supported by the acts' legislative history, history which is relevant to the extent the acts are arguably ambiguous as to the scope of their intended preemptive effect. An important purpose of the cable acts is to foster competition in the cable industry. (47 U.S.C.A. § 521(6).) This purpose is consistent with and promoted by enforcing the Cartwright Act's prohibition against tying arrangements which unreasonably restrain competition.[5] Further, section 27 of the 1992 Cable Act, an uncodified provision recorded in the act's legislative history, indicates it was not designed or intended to preclude enforcement of federal and state antitrust laws. (Pub.L. No. 102-385 (Oct. 5, 1992) § 27, 106 Stat. 1503, 1992 U.S. Code Cong. & Admin. News, No. 1, § 27, p. 1503 ["Nothing in this Act or the amendments made by this Act shall be construed to alter or restrict in any manner the applicability of any Federal or state antitrust law."].)[6]

---

[5]Respondent contends it is irrelevant that enforcing the Cartwright Act in this context may actually further the purpose of the cable acts because the United States Supreme Court has held that "an express preemption clause displaces all state laws that fall within its sphere, including consistent ones." (Citing *Morales* v. *Trans World Airlines, Inc., supra*, 504 U.S.at pp. 386-387 [112 S.Ct. at pp. 2038-2039] (*Morales*).) But the preemption clause at issue in *Morales,* a provision of the Airline Deregulation Act of 1978 (ADA), is not comparable to section 543(a) of the cable acts. In contrast to section 543(a), the ADA preemption provision prohibited "States from enforcing any law 'relating to rates, routes, or services." (504 U.S. at pp. 378-379 [112 S.Ct. at p. 2034].) The *Morales* court held that the scope of this preemption clause was so wide that it preempted even consistent state laws which had a connection with or reference to airline rates, routes, or services. (*Id.* at pp. 386-387 [112 S.Ct. at pp. 2038-2039].) However, the court did not announce a general rule that all preemption clauses automatically preempt consistent state laws.

The additional cases cited by counsel during oral argument are similarly unavailing because, among other things, they involve federal statutes which Congress clearly intended to have broad preemptive effects. (See *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 239 [79 S.Ct. 773, 776, 3 L.Ed.2d 775] [National Labor Relations Act]; *Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 739 [105 S.Ct. 2380, 2388-2389, 85 L.Ed.2d 728] (Employee Retirement Income Security Act].).

[6]Respondent's contention that section 27 cannot negate statutory provisions which expressly preempt appellants' claims begs the question. Our review of the relevant statutes and authority leads us to the conclusion that no statutory provision expressly preempts appellants' claims.

Respondent's reliance on section 556(c) of the cable acts is also misplaced. Section 556(c) provides that state laws inconsistent with the acts are "deemed to be preempted and superseded." (47 U.S.C.A. § 556(c).) As our analysis illustrates, the Cartwright Act provisions at issue in the present case are not inconsistent with the cable acts.

Our conclusion is also consistent with the Ninth Circuit's recent decision in *Total TV* v. *Palmer Communications, Inc., supra,* 69 F.3d 298 (*Total TV*), a case decided after the lower court issued its decision in the present case. Total TV was a nonfranchised "cable television dealer" which sued a franchised cable operator and the company that owned it, alleging defendants were attempting to drive it out of the relevant market by engaging in below-cost predatory pricing with the intent to destroy competition in violation of the California Unfair Practices Act, Business and Professions Code section 17043 (UPA). (69 F.3d at p. 300.) Total TV sought damages and injunctive relief. After removing the case to federal court, defendants filed a motion to dismiss, arguing Total TV's claims were preempted because the relief sought would prohibit defendants from charging their current rates and thereby effectively regulate them in contravention of the cable acts. (*Ibid.*)

The *Total TV* court held that the cable acts did not preempt the UPA provision upon which Total TV relied because the provision does not regulate rates but " 'merely fixes a level below which the producer or distributor may not sell with intent to injure a competitor.' " (*Total TV, supra,* 69 F.3d at p. 301.) The court rejected the precise argument embraced by the trial court in the present case, i.e., that a state law could be characterized as rate regulation because it authorized relief which would indirectly affect rates. The court reasoned that "[e]ven assuming that Total TV receives the relief it requests, Colony's and Palmer's prices will not be regulated directly and, as long as they do not act with discriminatory purpose, they will be free to 'sell [their] merchandise at any price [they] please in the ordinary course of business.' [Citation.]" (*Ibid.*)

The *Total TV* court's preemption analysis properly focused on discerning and effectuating congressional intent. The court found that (1) the statutory language used in the acts signified a limited preemptive intent; (2) the cable acts' purpose of fostering competition in the cable industry was complimented rather than undermined by declining to preempt the UPA provisions; and (3) the legislative history of the cable acts indicates Congress did not intend to preempt state antitrust laws of general applicability. (*Total TV, supra,* 69 F.3d at pp. 302-304.) In this third regard, the court specifically relied on section 27 of the 1992 Cable Act, which expresses Congress's intent not to preempt federal and state antitrust laws. The *Total TV* court held that " '[i]n light of the clear mandate of Section 27 that state antitrust laws not be preempted, § 543(a)(1) applies only to those situations involving a statute (or local ordinance) directly aimed at the cable industry and affecting or regulating rates.' " (69 F.3d at p. 303.)

Respondent contends *Total TV* is inapposite because it involved the UPA rather than the Cartwright Act. However, this distinction is not material to

our analysis. Indeed, we think it undeniable that the predatory pricing law at issue in *Total TV* has a more direct effect on cable rates than the anti-tying prohibition of the Cartwright Act. In any event, *Total TV* squarely supports our conclusion that neither the language nor the legislative history of the cable acts warrant preemption of state antitrust laws which may have an indirect effect on cable rates.

Respondent also argues that *Total TV* should not be followed because it is inconsistent with *Time Warner Cable* v. *Doyle* (7th Cir. 1995) 66 F.3d 867, certiorari denied __ U.S. __ [116 S.Ct. 974, 133 L.Ed.2d 894] (*Doyle*). *Doyle* addressed the legality of a cable operator's restructuring of its tiered services. Time Warner deleted certain channels from its basic tier and its standard tier and offered the deleted channels to new customers as a separate "a la carte" service. Time Warner continued to provide the "a la carte" channels to existing customers but began charging them an additional fee. (*Id.* at pp. 870-871.) The State of Wisconsin (State) argued that Time Warner's policy of charging customers for an unordered service and requiring those who did not want the service affirmatively to reject the charge constituted "negative option billing" in violation of the State's unfair trade practice law. (*Id.* at p. 871.) Both the 1992 Cable Act and an FCC regulation proscribed negative option billing. (See 47 U.S.C.A. § 543(f); 47 C.F.R. § 76.981 (1996).) However, the regulation carved out an exception in cases involving "the addition or deletion of specific channels from an existing tier of service." Time Warner argued that the State's unfair trade practice law was preempted by the federal regulation. (*Doyle, supra*, 66 F.3d at p. 872.)

Recognizing that preemption may occur through the promulgation of federal regulations, the *Doyle* court focused on the question whether the federal regulation authorizing Time Warner's conduct was consistent with the 1992 Cable Act. (*Doyle, supra*, 66 F.3d at p. 875.) The *Doyle* court found that (1) the 1992 Cable Act's statutory language prohibiting negative option billing was sufficiently ambiguous to require some agency interpretation (*id.* at pp. 876-877) and (2) the federal regulation at issue was a permissible interpretation of the congressional authority given to the FCC by the 1992 Cable Act. (*Id.* at pp. 877-881.) Though recognizing the act was not intended to preempt state consumer protection laws, the court found that section 543(a) of the act, which prohibits states from regulating rates, supported the FCC interpretation of its authority under the act as including the power to preempt state consumer protection laws which jeopardized the rate structure of cable company operators. (66 F.3d at pp. 877-881.) Thus, the court concluded that the FCC regulation which authorized Time Warner's challenged activities preempted the State's consumer protection law.

Respondent characterizes *Doyle* as "directly on point." In fact, *Doyle* addressed a much different question, i.e., whether the FCC had authority under the 1992 Cable Act to promulgate a regulation which expressly preempts state law. The *Doyle* court did not hold that the 1992 Cable Act preempts any state law which indirectly affects rates. It held, rather, that the FCC had authority under the act to promulgate a regulation which preempted a state law that only indirectly affected rates. Since we are faced with no comparable federal regulation in the present case, *Doyle* is inapposite.[7]

We conclude that the trial court erred by characterizing the Cartwright Act provisions as rate regulation. Further, state law provisions are not preempted because they may have some indirect effect on cable rates. In the present case, enforcing the Cartwright Act provisions would not have a sufficiently direct effect on rates to justify finding those provisions preempted by section 543(a) of the Cable Acts.

D. *The Provision in the Cable Acts Precluding States From Imposing Requirements Regarding the Provision or Content of Cable Services does not Preempt the Provisions of the Cartwright Act Upon Which Appellants Rely*

■ 47 United States Code Annotated section 544(f) of the 1984 and 1992 Cable Acts (section 544(f)) provides that a state "may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." (§ 544(f)(1).) According to respondent, section 544(f) prohibits states from regulating cable operators' tiering decisions. Respondent contends that section 544(f) is an alternative ground upon which to sustain the judgment.

The lower court found that section 544(f) does not preempt appellants' claims because that section prohibits state regulation of the content of cable

---

[7]The *Doyle* court did embrace the view that "[t]he rate structure is a federal matter and state consumer laws that impact upon it conflict with the operation of the rate structure." (*Doyle, supra,* 66 F.3d at p. 882.) However, we decline to take this statement out of the context in which it occurs. Indeed, the *Doyle* court expressly acknowledged the limitation of its holding by declining to disagree with *Time Warner Entertainment Co., L.P.* v. *F.C.C., supra,* 56 F.3d 151. In that case, the Court of Appeals for the District of Columbia held that the cable act *did not* preempt state and local negative option billing laws. (*Id.* at p. 194.) Instead of disagreeing with the *Time Warner* court's analysis (an analysis consistent with our conclusion in the present case), the *Doyle* court simply found that it faced a different issue, i.e., "whether the FCC regulation specifically preempts the enforcement of state negative option billing laws in the narrow situation of relatively minor adjustments in programming." (*Doyle, supra,* 66 F.3d at p. 880, fn. 17.)

programming and the Cartwright Act claims at issue in this case do not seek to regulate content. The court cited *Storer Cable Com.* v. *City of Montgomery, Ala.*, *supra*, 806 F.Supp. 1518 (*Storer*) as support for its conclusion.

In *Storer*, several cable operators argued that a local ordinance regulating competition among cable operators was preempted by section 544(f). (*Storer*, *supra*, 806 F.Supp. at pp. 1544-1546.) Rejecting this contention, the *Storer* court adopted the analysis of the only federal appellate court to interpret section 544(f) and found that the language of that section sheds little light on the provision's proper application but that its legislative history indicates that "§ 544(f)'s concern is with 'content-based rules' which require or forbid cable providers from carrying particular programming." (806 F.Supp at p. 1545.) The court concluded that the ordinance at issue was content-neutral and thus not preempted by section 544(f). (*Id.* at p. 1546.)

The appellate decision upon which the *Storer* court relied was *United Video, Inc.* v. *F.C.C.* (D.C. Cir. 1989) 890 F.2d 1173 [281 App.D.C. 368] (*United Video*). In that case, the Court of Appeals for the District of Columbia rejected several cable operators' challenge to FCC "syndicated exclusivity" rules which enabled a supplier of syndicated programs to agree with a broadcast television station that the station would be the exclusive presenter of the program in its area. (*Id.* at p. 1176.) The court held, among other things, that section 544(f) of the Cable Act did not forbid the FCC from adopting the challenged rules. (890 F.3d at pp. 1187-1190.) Finding the language of section 544(f) to be ambiguous, the *United Video* court concluded that the legislative history of this provision revealed that it was intended to prohibit content-based regulation of cable services: "[T]he key is whether a regulation is content-based or content-neutral. Section 544(f), one must note, does not simply forbid 'requirements'; it forbids 'requirements regarding the provision or content of cable services.' (emphasis added). The House report suggests that Congress thought a cable company's owners, not government officials, should decide what sorts of programming the company would provide. But it does not suggest a concern with regulations of cable that are not based on the content of cable programming, and do not require that particular programs or types of programs be provided. Such regulations are not requirements 'regarding the provision or content' of cable services." (890 F.2d at p. 1189.)

*Storer* and *United Video* support the conclusion that section 544(f) targets regulation of the content of cable services and does not, therefore, preempt the Cartwright Act provisions at issue in this case. Respondent does not argue that the anti-tying provisions regulate content. Instead it contends that

section 544(f) should be construed more broadly to preempt any suit "challenging a cable company's tiering decision." Respondent's contention is not supported by the only authority it cites, *Cablevision Systems Corp.* v. *Town of East Hampton, supra,* 862 F.Supp. 875 (*Town of East Hampton*). The discussion in that case upon which respondent relies addressed whether a franchising authority could revoke a cable operator's franchise for violating a franchise agreement by eliminating a previously available "tier" of service without obtaining prior City approval. The *Town of East Hampton* court held that such a revocation was precluded by the cable act which limited a franchising authority's power to regulate cable services to enforcing valid requirements "for broad categories of video programming or other services." (47 U.S.C.A. § 544(a)-(b).) The court noted that the cable operator's restructuring of its tiers did not affect a broad category of programming or services but merely restructured the manner in which its programming was packaged. According to the court, the cable act precludes franchising authorities from enforcing franchise requirements "that usurp the cable operator's power to determine the details and particulars of the provision of cable service." (*Town of East Hampton, supra,* 862 F.Supp. at p. 886.) Thus, the court held that the franchising authority had "no authority to regulate such a particular as the manner in which Cable service is packaged for the Consumer." (*Ibid.*)

*Town of East Hampton* does not advance respondent's argument that this case is preempted by section 544(f) for several reasons. First and foremost, *Town of East Hampton* did not discuss or even refer to section 544(f). Second, *Town of East Hampton* is distinguishable from the present case because it involved a regulation which expressly and directly regulated cable services. Here, any effect on the cable operator's tiering decisions is only incidental to the enforcement of state antitrust law. Finally, to the extent *Town of East Hampton* stands for the general proposition that the Cable Acts preclude regulation of the "manner in which Cable service is packaged for the Consumer," that proposition is not offended by our holding in the present case. The anti-tying provisions of the Cartwright Act do not regulate the manner in which cable services are packaged. Rather, they preclude a cable operator from depriving its customer, in a manner which unreasonably restrains trade, of *a choice* as to what package the customer wishes to purchase.

In any event, respondent has failed to provide authority to support its broad interpretation of section 544(f). Since the Cartwright Act provisions relied on by appellants do not seek to regulate the content of cable services, they are not preempted by section 544(f). Thus, none of the grounds asserted

by respondent support the trial court's ruling that appellants' state law claims are preempted by the 1984 and 1992 Cable Acts.

## IV.  DISPOSITION

The judgment is reversed. Costs on appeal are awarded to appellants.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied March 21, 1997, and the opinion was modified to read as printed above.